Tucker. I represent Fort Bend Independent School District in this appeal of the District Court's decision under the Individuals with Disabilities Education Act. There are two main issues before the court today and one is whether or not a student who is passing his classes and advancing from grade to grade. Ma'am would you speak a little more slowly? I apologize. The first question is whether a student who is passing his classes and advancing from grade to grade and at the same level and the same rate as his non-disabled peers is receiving the level of educational benefits to which he is entitled to under the IDEA. If that level of benefit is not sufficient then you would need to reach the second issue and the second issue is whether a public school district has a duty to pay for a student to be in a private out-of-state residential mental health facility for the purposes of receiving therapies designed to cure his underlying mental health illness. As I understand it, the law does not require that an IEP actually result in improvement. Is that right? That is true. It has to be reasonably calculated to result in meaningful educational benefits but it just at the time it's developed has to be designed to do that and if it doesn't end up resulting in benefits then the ARD committee that the group that is, you know, has the duty to develop that has to come back to the table again and figure out what is going wrong and again develop a new IEP that they think going forward is reasonably calculated to result in meaningful educational benefits. If you would, of the two issues that I talked about, if you reverse the district court on the preliminary question there's all this reference to the parents allowing this young man when he was in eighth grade to smoke marijuana and I just wondered if the appropriate referral to child authorities had been made by the school in light of that evidence because there's a requirement to report child abuse which includes expressly permitting someone a child to use controlled substances such as marijuana. It's not in the record whether or not the school or anybody in the school because that is an independent duty that each teacher that knew or each administrator that knew would have had to do and they would have done that anonymously to CPS and CPS... I just want to make sure it's been done. I'm not saying that it actually happened that they let him use it but there is that allegation in the record and I found that very disturbing separate and apart from this issue and there's very broad language in the statute about sort of anybody having this duty and so on report whatever the duty being a little different for professionals than for everybody else. I just want to make sure it happens so would you please see to it that it has happened and if not make sure that that report has been made properly assuming that the statute has been met. I can certainly follow up on that. Okay, I appreciate that. Turning back to the first issue about the level of educational benefits that students are entitled to, it was over 30 years ago when the United States Supreme Court in Raleigh said that when a student is being educated in the regular education classrooms in our public schools that his individual education plan should be reasonably calculated to result in his passing his classes and advancing from grade to grade and that is exactly what happened in this case. He was in regular education classes in Fort Bend Independent School District and he was passing his classes and he was advancing from grade to grade up until the time the parents removed him from the school and put him in a facility in Utah, first in Utah and eventually at another place. Is your primary complaint that they didn't give you enough time to deal with this this RAD diagnosis, R-A-D diagnosis or is it that there there just never would be a situation where where his residential placement would be compensable by you all? Oh, I think there might have eventually been a time when he needed a residential placement but he was nowhere even near reaching. Is that because they didn't give you all a chance to deal with that? Correct. At the time that they pulled him out of school, he had passed all of his classes and he had advanced grade by grade and they were implementing a program that was specifically designed to address his specific disabilities as they manifested themselves in the classroom and he but they pulled him out before the first grading period even happened after we had implemented that IEP. Now had that first grading period come and he had failed some classes or done miserably, that is when the art committee would have come back and said that wasn't enough and perhaps they could have increased the psychological services, they could have changed the behavior plan, they could have even determined that it was finally time to pull him out of one of those regular education classes and put him into maybe one special ed class where he had a special ed teacher who especially trained to help him deal with those behaviors. I'm sorry, finish your answer. I didn't mean to interrupt. Just that they could have helped him deal with those behaviors in all those classes and hopefully started passing again. As I understand it, the reactive attachment disorder, RAD, diagnosis was first suggested when he was in the facility C-A-L-O, you know, I believe that's in Ohio, after he had been pulled out of school without notice by his parents and sent first to the camp in Utah and then to C-A-L-O, Cal-O. Is that where the first suggestion of this RAD problem was made? The district court actually says that Mr. Fawson at the Utah facility mentioned it. He mentioned it at the hearing anyway and then the dad testified that he might have told the school at that RAD meeting in November that the facility in Utah thought he had reactive attachment disorder, but it's not in writing anywhere in the record at all. It was never actually given as a diagnosis to the student. Because it seemed to me that that was the determinative point, that when he was diagnosed with RAD, that changed the whole ballgame, but it doesn't seem that RAD had ever been suggested while he was in school. It was never suggested while he was in school. It was not on the table and in fact the therapies that he is receiving at C-A-L-O that address the reactive attachment disorder, no one at the school knew about these therapies until the due process hearing when Dr. Huey got on the phone and testified that here is what we're doing for this student. And Dr. Huey is at C-A-L-O? He is the director and founder of the C-A-L-O facility, correct. Where is Z-A now? I believe he, counsel may talk to that best, but I think he's at a facility in West Texas. He's still there. Not at C-A-L-O. I know, but they moved him to West Texas. That was referenced in the briefs, that's where he is. And what grade is he in now? I believe he would be a Is he making progress now? I am completely unaware of his current progress at that facility. I guess to me this is a very difficult case because Z-A has a lot of overlapping problems. I mean, he obviously has this reactive affective disorder, whatever, RAD, but he also has this drug use and other issues and what, I guess, I'm just wondering, what is your, what principle would you announce for dealing with a young man who has this constellation of issues? A drug problem, an underlying disorder of some sort, and then the outward appearance of not caring and saying he just wants to deal drugs and he doesn't want to go to school and all of that. How do you rectify that in the context of this whole IEP and the school district's obligation? Am I making sense? I just am looking for what you would announce for the future. Well, I don't think that actually the court's decision here is going to change much that wasn't already changed by the Hovum decision because that is exactly what happened in Hovum is you had a student who had a disability and written expression. He was doing well across the board while accepting that one little area that he was impacted by his disability, but what you have to do is you look at the educational benefits that the child has received. All children with disabilities have weaknesses and they're going to continue to demonstrate those. In Hovum, we didn't have this overlay of the drug problem and all of that. It seemed like it was you had a bright young man who was reasonably motivated, maybe sometimes kind of misstating what he's really doing, but he was reasonably motivated, bright, and all of that, and he has this issue somewhat probably compounded by a language issue having immigrated from elsewhere with this written expression. I understand why you cite to Hovum. I think it is a good case for you. I'm just not sure it's quite what we're dealing with here. I think what the bottom line of this is is you have to look at what is the school's duty to students with special education and it's what is their duty and it's to educate them and that's what Fort Bend was doing for Z.A. He had, you're correct, numerous other issues, but the school's duty is to accommodate those issues and address them in a manner that he can continue to learn while he is in the school and that is what it did. The school is not, does not have an obligation to treat anxiety or to treat depression or to try to cure a reactive attachment disorder. It has to focus on educating the student. But if he can't learn until you treat, I mean, in other words, if the drug problem is really self-medication for his anxiety, you're never going to get anywhere unless you deal with that, right? I mean, I think that was what Judge Gilmour was getting at in some of her opinions. And you know what, it may be that maybe someday in the future Z.A.'s disability may have impacted him enough that it got to that point, but when he left Fort Bend, he was learning. He was passing his classes. He was advancing from grade to grade. He was... He failed and had to go to summer school and all of that. So, I mean, there was a period of time he was doing okay and then it started, I think, getting more acute. I think that was what led to the parents' interventionist activity, right or wrong. Well, and I think that those isolated failures right at the end of eighth grade is also what led Fort Bend to put him in special ed. You have to remember, he was not in special education during that eighth grade year. He was put into special education between his eighth grade year and his ninth grade year. So, all those special education supports, that inclusion teacher going into the regular ed classroom, the psychological services, none of that was being provided until ninth grade. That was when they all those services to help him overcome those behaviors that impacted him in the classroom. So, I think that the most critical error in the district court's analysis is its conclusion that undisputed evidence of academic achievement can be ignored if the school has not done enough to remediate the disability because that is just simply not what schools do. They don't remediate disabilities. They accommodate them and provide the special ed. support and services they need to continue to learn. That was sort of what I was referring to earlier, that there's no requirement in the law that there be an improvement, only that there's a program that's reasonably calculated to address the issue. You can't look back later and say, oh well, he was a C student, he never became a B student, therefore the plan failed. Correct, because schools do not have to maximize a student's potential under the IDEA. They just have to provide a meaningful educational benefit. That is all they have to do. Parents are obviously free to try to go outside and get other therapies if they want more for their child than the IDEA provides, but the IDEA does not burden schools with doing that for students. The educational... You're saying it might could have gotten to the point that they had to deal with the underlying anxiety, etc., but it hadn't yet gotten there. If his behaviors in the classroom were such that they were interfering with his ability to learn, then that is something that our committee would have had to consider when it happened. You're saying it hadn't gotten there. Not with Z.A. Not with Z.A. it hadn't. Our committee had not met at a time when he was not passing his classes and not advancing from grade to grade, not passing the state-mandated tests, and even on the achievement testing that it showed that despite the behaviors in the classroom, he was achieving at or above the level of his non-disabled peers, even right before he started high school. He still had those high levels of academic achievement. But the educational benefits that are to be conferred by the IDEA are not defined exclusively or even primarily in terms of correcting the child's disability. In other words, what Z.A.'s educational plan had to do, it didn't have to directly address anxiety. It didn't have to directly address depression. What it had to address were the behaviors that he exhibited in the classroom because of his anxiety and depression, and that's what Z.A.'s IEP did, and it did it in numerous ways. What was the basis given by the school district at the due process hearing, the between the 8th and 9th grade? I think part of it was because he was doing so well and I think the marijuana abuse had probably kind of masked what really was going on because, you know, when you know of a kid who admits to extensive marijuana use and he's not motivated in the classroom, it made sense to the teachers. And then when they did refer him and evaluate him, they immediately found him eligible. But I would like to point out that the timing of that evaluation is not before the court because that was a procedural error or possible procedural error that the parents had raised in the due court found against the district on the timing of that evaluation. So that's really not the issue before the court. It's whether the program that was developed in August after we determined he was eligible was appropriate, whether it was reasonably calculated going forward to result in meaningful educational progress. All right, Ms. Tucker, you've saved time for rebuttal. Thank you. May it please the court, Harold Gold on behalf of the Appalachee. The first time I read this court's opinion in Richardson Independent School District versus Michael Z, I had to stop in the middle of the statement of facts because I was reading my own story right down to the very high school. See, your honor, I have one of these kids. And why do I tell you that? There's two reasons. First, what these kids do to the parents is as much as the impact on the student. It's an up and down. You jump every time the phone rings. You don't know what the next day is going to bring or if that kid is even going to be there anymore. So when these parents have to make decisions, it's not in the cool reflection. They are as changed as the student. What's the second reason I tell you this? Because these kids are always changing. The only smart advice I ever got from my daughter's pediatrician is we can't really study these kids because they don't stay a little long enough for us to evaluate them. You never see for these kids a report that tells you exactly what's wrong with them. Why don't we get to the facts and the record in this case instead of your own experiences? I'll be glad to, your honor. You, in fact, have already decided this case, the Bobby R. case. You stated the issue as how do we measure academic achievement. And in that case, you looked at a dyslexic boy and you had the very same argument. Well, he was passing from grade to grade and you rejected it. You said, no, that's not the purpose. And you looked at the courses that were directly related to the disability, the reading classes, the writing classes, the math class for the dysgraphia. And how do you explain HOVM? I mean, that was the argument in HOVM, that you need to look at the specific disability and not just the overall achievement of the young man. And that argument was rejected over a dissent, no less, than cert to not. For whatever you want to take HOVM for, and I'll be candid with you, I take it for very little. Judge Stewart was exactly right. Well, Mr. Gold, here's the problem. And you know what? I respect your passionate connection to the issue, and I appreciate that. But the problem is we are required to apply dispassionate rules. We can't allow our emotions and our feelings about the case to impact how we rule. So I respect where you're coming from, but I don't think that helps us with HOVM, which you didn't really distinguish much in your brief, because that is binding precedent on us. Well, it's one of your cases. It's no more binding than the case you made in VP, Your Honor. But let me tell you why Judge Jones actually helps you here. Here's what she wrote. Certainly, given the wide range of disabilities covered by IDEA, remediation may often be part of an IEP. Behavioral modifications, for instance, immediately come to mind as an example of an IEP strategy that may remediate a disability while also being necessary to confer educational benefit. HOVM specifically excludes the very problem you have in front of you today. Judge Jones recognized there are, in fact, instances where remediation may be called for, and she points to behavior, the very issue in this case. So I would tell you that HOVM stands for the proposition that you can't use Judge Jones' analysis of an overall education benefit. You have to look to the actual IEP. So let me tell you what my main problem with your position is, and that is that it appears that this young man had a lot of problems. They're trying to deal with him. He's passing and doing okay. Then he has this situation where he fails some classes, goes to summer school, shows up for school after that, and they almost immediately pull him out of school and never give the school an opportunity, as you say, children change and evolve and whatever, to deal with whatever evolution ZA may have that now requires a new strategy. They just pulled him out and put him in this camp. I'm not faulting the parents for that. They clearly needed to do something with this young man. But that said, whether the school has to pay for it and whether the school is responsible for it, I have trouble with the fact that they weren't really given a chance before he was pulled out to deal with that. Well, let me help you understand that they had plenty of chance and didn't because this child had a 504 plan since the time he was in first grade. To have a 504 plan, the school had to conclude that he had a disability that substantially impaired a major life activity, and that activity was learning. So from the first grade, the Fort Bend Independent School District knew that he had a disability that impacted his ability to learn. And they always did the same thing. They stuck him in the first row of the class because that's what you do with ADHD kids. I have to wonder with all the ADHD kids how big that first row must be because somebody has to begin to get moved to the next one. They never changed what they did. They never, in fact, evaluated this child. The testimony is that even though the standard for putting him in 504 was the same as IDEA, they never actually conducted an evaluation. They didn't conduct a reevaluation. Your opponent says you sort of missed the boat procedurally on complaining about first grade and all of that. I'm not raising a claim for what they did in the first grade. I'm only telling you that they always did the same thing. They always knew what the problem was. Well, they didn't know this RAD diagnosis, but I guess what I'm wondering is we have to focus on the time frame in question. Exactly. And their argument is, you know, here's a guy who's been doing okay, passing classes, you know, whatever, flunked some classes, takes summer school, remediates, and now he's back in the school year. And before even the first grading period is up, they're pulling, his parents are pulling him out, and the next thing the school knows, it's getting a bill for that. And it's saying we didn't have a chance to say, hey, this plan, this IEP isn't working. We need to do a different one. And I want you to respond to that point. I want you to forget about RAD. I want you to focus on depression because those are the characteristics, and they knew those characteristics, and they knew it long before October. In fact, the school psychologist admits they knew about it. They didn't change how they dealt with him. They gave him the same exact 504 plan, knowing from the diagnosis that they performed that his depression was linked to his inability to learn. And that school psychologist, not just a psychologist, someone who has specialized training and is a licensed specialist in school psychology, did nothing to change the approach. What is there in the record here that establishes inability to learn, given the record of the grades and the passing grade to grade? Two things. One, he had a 504 plan, which to have one, they had to determine that he had a disability that substantially impacted a major life ability. That's conceded. Second, if he didn't have a disability that impacted his ability to learn, he wouldn't be in special education because that's the requirement. By reason of a disability, he needs specialized education. Not if he's learning and passing his grades and being promoted from grade to grade, then there's no inability to learn. Whatever the cause may have been, it may have been that Aunt Sally counseled him at home. We don't really know what was going on with why he had an inability to learn, but he did have an ability to learn. I don't think I'm following the approach you're taking, Your Honor, because it's a matter of law. You are saying that there was an inability to learn. It impacted his ability to learn. That's why he was in special education. That's what the ARD Committee determined, not me. They determined he required special education because his disability impacted him. What is the test that we apply to whether he had the ability to learn? What better test could there be than the fact that he's passing his courses? That test isn't even before you. That's not what you're required to look at on this appeal. Your appeal is whether or not the IEP that was required was reasonably calculated to enable him to achieve meaningful educational benefits. It looks whether it did. Sure. Okay, and so Judge Smith's point is, I believe, and I'll just make it my point, that he was learning. He was passing classes. The ones he failed, he remediated in summer along with a bunch of other people who don't have any disability who had to take summer school. And now he's back. Now here we are at the threshold of the new school year. And instead of allowing the plan to continue on or come in and say, hey, the plan isn't working anymore, he's not turning in his lessons or whatever, they pulled him out and took him off to this residential care. And, again, I understand the passion and the feeling of the parents. And my earlier comments about concerns about their permission to use drugs do not mean to reflect that they're overall bad parents. I do have a concern about that one. But I know that this is a difficult area. I'm not taking away from that. So whether it's understandable or not that they might put him in the residential care and whether that was helpful to him or not isn't the issue from the school's perspective. Because the problem is, of course, it gets very expensive to do all of this. And so the whole statutory scheme is trying to balance the need for each child to be given a free, appropriate public education with the need for the fact that you can't impose just unreasonable burdens on schools. So the balancing here is what Judge Smith said, is the person being able to learn, even if they're not getting maximum improvement on their life and their conditions. Well, here's what this court wrote in Houston ISB v. VP. And you were on that panel, Your Honor. Before acceptable test scores and advancing in class, grade can be seen as supporting that educational benefits are being received. Those indicia must arise from compliance and not deviation from the IEP. So my question to the court is, what evidence is there that he was passing from grade to grade as a result of what they were doing from his IEP? Well, the problem is he was pulled out of school before even the end of the first nine-week grading period, the fall after the IEP was adopted that summer. The IEP was exactly the same as the 504 plan that had not worked. And where is there any indication that that finding by Judge Gilmour is clearly erroneous? There's none. If this was any other civil case, I don't know that we would be talking about this. The standard is, did she clearly err in her finding that there was no educational benefit? But the problem is with this IDEA action, we have to look to the IEP and not the 504 that had been in place before. And I haven't charted them to see how they might differ. It adds one thing, psychological counseling one hour each week for nine weeks. And after the very first session, the school psychologist determined there's nothing I can do for this kid. He obviously needs to go see a drug counselor. So there was unilateral deviation from the IEP. He didn't get any psychological counseling. Say again, it was one hour per what? One hour per week for nine weeks, which was abandoned after the very first instance, and not by virtue of a decision by the ARD committee. So did the psychologist then refuse to see the DA again? Yes. Was a drug counselor substituted for that one hour a week? No. Okay. The drug counselor handed him the standard brochure, and that was it. But here's what I'd also like you to focus on. There is zero evidence in this record about marijuana use. There is zero evidence in this record about how any marijuana use was correlated to any performance or nonperformance. There is no expert testimony about the impact of any marijuana use on the conduct that this student displayed. What's the basis then for the briefing on the parent saying we allow him to smoke marijuana at home as long as he's not smoking it out in public? Is that something the school district just made up? I don't know whether they made it up or not, but that doesn't – Surely you do. It's either in the record or it's not. It is in the record, and the principal does testify that she talked to the mother, and the reason it mattered to the principal was because he came to school. But there's no evidence he ever came to school under the influence of marijuana. In fact, the school psychologist who conducted the evaluation said she didn't believe whether he used marijuana or not, and that's why she didn't make any notations about it. Okay, so your opponent sort of accuses your side of wanting to put the marijuana use outside the school and kind of put it in a cubby somewhere, but then also wanting to bring his outside the school conduct in as a basis for why you needed to sort of treat the underlying conditions in order to allow him to learn. Can you address that? I don't see that any outside conduct was brought in. All we've ever talked about is the school, is the conduct in the school, his inability to do any work in the school, the fact that he put his head down in every class in the school, the fact that the school pulled him out of class and stuck him in the principal's office simply to make up work. They are the ones who have conceded he could not perform in the classroom, and they devised their own program. They stuck him in a room to do nothing but work on homework. That was the answer, and it still didn't work, and yet that's the same approach they kept using over and over, somehow thinking they would get a different result. And the parents shouldn't have to wait until you have a case like the state of Montana-Lance versus Louisville Independent School District that this court issued this year, where no one thought the fourth grader really meant that he was going to commit suicide until they walked into the nurse's office and found him hanging there. I'm going to interrupt you to go back just because I was looking up some references here. I thought I heard you telling us that there was no record of marijuana use, and then you kind of backtracked on that when asked some questions, so let me ask you this. My understanding is that the record has references to his continuing to inform teachers of his aspirations to sell narcotics and that he discussed his drug habit during a meeting with the school psychologist. Does the record contain generally those things that I've just described? Absolutely. Now, how much marijuana did he use and how often? You know what? You've just lost all of your credibility with this court because you tried to mislead us a few minutes ago to say that there was no record of marijuana use, and believe me, we will read the record and determine whether you have any credibility as a lawyer in this court after what you tried to tell us a few minutes ago. It was very sly of you the way you said it, but you're an officer of the court. I am. No, don't interrupt me. You're an officer of the court, and you have an obligation to be frank with us about what's in the record, and you've just told us that this student was telling officials at the school of his desire not only to deal drugs but to use them. I mean, excuse me, not only to use drugs but to deal in them. And what I told you and what I'll stand by is there's no evidence in the record of the amount of marijuana he ever used or smoked or sold or how that impacted his behavior, if at all, in the school, and that is what I told you and that is what I'll stand by. You said there was no evidence of use rather than amount of use. If I said use, I misspoke. I said amount of use and how it related to his behavior. I'm talking to you about his behavior. I don't know whether, you know. So I guess what I'm trying to get to is he's obviously a troubled young man. A school district cannot solve all of those problems. And so he's going through classes. He's passing. He fails some. He goes to summer school. He remediates. Now he starts the school year, and he's continuing to have problems. At that juncture, is it your contention that the law allows the parents to take matters in their own hand without convening a new meeting of the committee and asking for changes to the IEP, take matters in their own hands, put him somewhere else, and charge the school district for it? Yes, because my position is that. And that's based on what case or what statute? On IDEA. The parents have the right to unilaterally withdraw their child when they do not believe that the education the school is providing is calculated. What section? I want to go look at it and get it firm in hand. What section of the IDEA do you want me to go look at? I've got it in my brief. I cannot give you a specific number from the desk. I apologize. I just don't have the memory to do it. I briefed it for you extensively. I read your brief. I didn't get that from it. The IEP, by definition, has to be reasonably calculated to provide a meaningful benefit. In the Carter case, the Supreme Court held that the parents do have the right to unilaterally withdraw and that they are entitled to reimbursement if that placement is appropriate. That placement does not have to match the same requirements as the statute. That's what the school has to do. That's not what the parents have to do. The parents, as I understand the procedure, were required to sign off on this IEP. That's exactly right, and they did. And I would assume that they understood that the child was no longer seeing the psychologist. You've said the psychologist only saw the child one time and then said, Go see a drug counselor. They did not know that. They had not received any reports from the school. That's in the record? That is in the record, I believe. They did not know that the school psychologist had found—I'm sorry, I'm out of time. Thank you, Mr. Tucker. Mr. Tucker, you've saved time for rebuttal. Thank you, Your Honors. The first thing I want to address is the allegation that the school psychologist unilaterally stopped providing services after one week. It's very clear in the record that the ARD recommended 60 minutes one time per nine-week grading period, and the hearing officer understood that as well. And, in fact, the parent's lawyer understood that as well. She had it in her original due process complaint that the one hour per nine weeks was insufficient. But because the district court misread the record and believed that the ARD had said 60 minutes every week, now they've latched onto that and are trying to say that he unilaterally stopped providing services. The ARD, it's in the—not the record on appeal, but in the administrative record at page 1496, is the ARD where it specifically says it's 60 minutes per grading period. And then the psychologist's log of the time he saw Z.A. is in that same record at page 1676. He actually saw Z.A. for 75 minutes during that first grading period before he was withdrawn. So there was no unilateral— But did the psychologist refuse to further treat? Absolutely not. Absolutely not. I think the last thing he got in his log, I think it talks about how he had gotten the records request from the facility— or from the educational consultant that the parents had hired was wanting records. But you can look at his log on page 1676. What he did do is when he first called Z.A. in to talk about, you know, how's it going, he had already looked at his discipline record to see how it was going that way. But he called Z.A. in, and Z.A. started talking about the marijuana and how much he liked that. So he did—Mr. Marsh was the psychologist. He referred Z.A. to the school's drug counselor. And then he followed up—you can see in his log—he followed up the next week to make sure Z.A. had gone to see her, as he had suggested. But there was no reason whatsoever to say that that psychologist said he was no longer going to provide the services that had been ARDed. So Mr. Gold has misrepresented the record to us in that respect? I think he has represented to you what the district court—how the district court looked at the record. But that is not the hearing officer's view of it, and it is certainly not what is actually in the record. The other thing I'd like to talk about is just—I need to make sure and distinguish the V.P. case. That was talked about a little bit in V.P.'s grades. It's very distinguishable. In V.P., she didn't start passing until the teacher had started modifying the curriculum. And so the court found that because her passing grades weren't really representative of what we think they are, and that's a mastery of the entire curriculum, they weren't entitled to as much weight when you were looking at educational benefit. But that's not what happened in Z.A.'s case. Now, the psychologist that was treating him under the IEP, that first nine-week period, did he or she testify at the due process hearing, or were just the records introduced? I do know that he—on certain questioning, he said he didn't think there was anything more he can do. But I think if you read it all in context, he meant there was nothing more he could do about Z.A.'s anxiety and depression with respect to counseling. My question is, do we have his testimony in the record from the due process hearing? It is in the record. It's in the administrative record. Right. And as I understand it, there was no new evidence presented to the district court. Correct. So all we're dealing with is that due process hearing. Correct. Correct. Would you agree it's a clearly erroneous standard on fact findings by the district court? Not when you look at the fact that the educational benefit standard that the court was considering was legally erroneous. Okay, that's a different question. You can say the judge applied the wrong legal standard. That's a legal question. But when we get into the facts, did Z.A. use marijuana? I mean, if that's relevant. And the judge says yes or no, that's a clearly erroneous standard. That is a fact finding, yes. It's only the ones—it's the fact findings that are made based on that erroneous view of what educational benefit means. And when those findings are made regarding educational benefit, then it's de novo. But if we—okay, so if we disagree with the standard, the legal standard that the judge applied, should we send it back to the district judge or should we make our own findings? That's what it's sounding like you're saying. No, you do not need to send it back. It's de novo on the facts. There's nothing else? All right, thank you, Ms. Tucker. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock.